**No. 20-\_\_\_\_\_**

IN THE

# United States Court of Appeals
### FOR THE
# Third Circuit

**AMF Pensionsförsäkring, AB,**

*Plaintiff-Respondent,*

v.

**Celgene Corporation, Scott A. Smith, Terrie Curran, and Philippe Martin,**

*Defendants-Petitioners.*

On Fed. R. Civ. P. 23(f) Petition from the United States
District Court for the District of New Jersey
Case No. 18-cv-04772

## PETITION UNDER FED. R. CIV. P. 23(f) FOR PERMISSION TO APPEAL CLASS CERTIFICATION

Matthew J. Rubenstein
JONES DAY
90 South Seventh St.
Suite 4950
Minneapolis, MN 55402
Tel.: (612) 217-8800
Fax: (844) 345-3178
mrubenstein@jonesday.com

Robert C. Micheletto
Nina Yadava
Rajeev Muttreja
JONES DAY
250 Vesey St.
New York, NY 10281
Tel.: (212) 326-3939
Fax: (212) 755-7306
rmuttreja@jonesday.com

*Attorneys for Defendants-Petitioners*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Celgene Corporation makes the following disclosure:

1.  For non-governmental corporate parties please list all parent corporations:  Bristol-Myers Squibb Company ("BMS Co.") is the parent corporation and 100% owner of Celgene Corporation.

2.  For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:  No public company owns 10% or more of Celgene Corporation.  Celgene Corporation is a wholly-owned direct subsidiary of BMS Co.  No public company or other party owns 10% or more of BMS Co.

3.  If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:  BMS Co., as parent and 100% owner of Celgene Corporation.

4.  In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and  3) any entity not named in the caption which is active participant in the bankruptcy

proceeding.  If the debtor or trustee is not participating in the appeal, this information

must be provided by appellant:  N/A.


Dated: December 14, 2020　　　/s/ Rajeev Muttreja＿＿＿＿＿＿＿＿＿＿＿＿＿

*Attorney for Defendant-Petitioner Celgene Corporation*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT................................................................i

TABLE OF CONTENTS..............................................................................................iii

TABLE OF AUTHORITIES.......................................................................................iv

PRELIMINARY STATEMENT ..................................................................................1

QUESTION PRESENTED...........................................................................................2

BACKGROUND...........................................................................................................2

    A.   AMF's Complaint .................................................................................2

    B.   The District Court's Class Certification Ruling .................................4

RELIEF SOUGHT .......................................................................................................9

STANDARD OF REVIEW .........................................................................................9

REASONS FOR GRANTING THE PETITION........................................................10

I.   This Court Should Grant Review to Clarify the Application of the *Basic* Presumption After *Halliburton II* ..................................................................10

    A.   The District Court Misapplied *Halliburton II*'s Instruction that "Any" Type of Evidence Can Rebut the *Basic* Presumption ........................11

    B.   This Court Should Clarify What Burden Defendants Must Meet in Order to Rebut the *Basic* Presumption .............................................13

II.   The District Court's Decision Was Erroneous........................................................15

CONCLUSION .............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972) ....................................................................................5

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    955 F.3d 254 (2d Cir. 2020) ......................................................................15

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................*passim*

*Bing Li v. Aeterna Zentaris, Inc.*,
    324 F.R.D. 331 (D.N.J. 2018) ...................................................................14

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    No. 12-cv-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015)..............12, 14

*Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"),
    563 U.S. 804 (2011) ....................................................................................5

*Glover v. Standard Fed. Bank*,
    283 F.3d 953 (8th Cir. 2002) .....................................................................10

*Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"),
    573 U.S. 258 (2014) ............................................................................*passim*

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
    818 F.3d 775 (8th Cir. 2016) .....................................................................14

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) .....................................................................14

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17-cv-1580, 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ......7, 16, 20

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011) .....................................................................9, 10

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ........................................................................7

*In re Omnicom Grp. Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2009) ...................................................................16, 20

*Lupyan v. Corinthian Colls., Inc.*,
    761 F.3d 314 (3d Cir. 2014) ......................................................................14

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Malack v. BDO Seidman, LLP*,
  617 F.3d 743 (3d Cir. 2010) ..................................................................10

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013)......................................................7, 16, 20

*Mielo v. Steak 'n Shake Operations, Inc.*,
  897 F.3d 467 (3d Cir. 2018) .....................................................................5

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) .............................................................. 9, 10

*Rodriguez v. Nat'l City Bank*,
  726 F.3d 372 (3d Cir. 2013) ..................................................2, 9, 13, 15

*Roofer's Pension Fund v. Papa*,
  333 F.R.D. 66 (D.N.J. 2019) ..................................................................14

*Stein v. Tangoe, Inc.*,
  No. 13-cv-286, 2014 WL 12767210 (D. Conn. Sept. 30, 2014) ......................... 16, 20

*United States v. Schiff*,
  602 F.3d 152 (3d Cir. 2010) ..................................................................20

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
  775 F. App'x 51 (3d Cir. 2019)................................................................10

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*
  No. 13-cv-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ....................................12

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  325 F.R.D. 280 (D. Minn. 2018) ......................................................7, 16, 20

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)................................................................ 7, 14

*West v. Prudential Sec., Inc.*,
  282 F.3d 935 (7th Cir. 2002) ..................................................................10

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ....................................................................6

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .......................................................................................*passim*

Fed. R. Evid. 301 ........................................................................................ 1, 13, 14

## PRELIMINARY STATEMENT

In federal securities-fraud cases, class certification often depends on whether the plaintiff can secure the presumption of reliance first set forth in the Supreme Court's decision in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Without this presumption—which is rebuttable and not conclusive—individual issues of reliance (a necessary element for federal securities-fraud claims) would overwhelm the common issues required to maintain a class.

In *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258 (2014), the Supreme Court reiterated *Basic* and emphasized that the *Basic* presumption of reliance can be rebutted by defendants at the class certification stage through "[a]ny showing that severs the link between [an] alleged misrepresentation and either the price received (or paid) by the plaintiff." *Id.* at 268-69. Much remains unsettled about this standard, however, particularly in this Circuit, as this Court has never construed *Halliburton II*, and the courts of this Circuit—including the district court here—have misunderstood what the case requires.

This Rule 23(f) petition presents an excellent opportunity to clarify at least two aspects of how the *Basic* presumption operates after *Halliburton II*. First, does rebutting the presumption require "direct evidence" of no price impact, as the district court held? *Halliburton II* instructs that "direct as well as indirect" evidence suffices. And second, does a defendant seeking to rebut the presumption bear a burden of persuasion, as the district court also held? Federal Rule of Evidence 301, other case

- 1 -

law in this Circuit, and even *Basic* itself all indicate that a defendant bears only a burden of production for rebutting the presumption. These issues are "novel or unsettled" in this Circuit, their resolution would "facilitate development of the law on class certification," and the district court's rulings on them "were erroneous." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 376 (3d Cir. 2013).

The district court further erred by holding that Defendants failed to rebut the *Basic* presumption, and by certifying a class. Under any standard, but particularly when *Halliburton II* is correctly applied, Defendants' showing rebutted the presumption of reliance. And the district court made other errors too.

Rule 23(f) review is particularly common and appropriate in securities-fraud cases. Indeed, *Halliburton II* was itself a Rule 23(f) appeal, and this Court previously granted a Rule 23(f) petition to construe *Halliburton II* (but the case settled before a ruling). Here too, Rule 23(f) review should be granted.

## QUESTION PRESENTED

Should this Court grant review of the district court's class certification order to clarify what evidence suffices to rebut the *Basic* presumption of reliance and to correct the district court's erroneous ruling?

## BACKGROUND

### A.   AMF's Complaint

Plaintiff AMF Pensionsförsäkring AB ("AMF") was appointed Lead Plaintiff in this action on September 26, 2018. AMF subsequently filed an amended complaint

- 2 -

asserting claims against Defendant Celgene Corporation ("Celgene") and ten current or former Celgene officers and employees under Section 10 of the Securities Exchange Act of 1934, Securities and Exchange Commission Rule 10b-5, and Section 20(a) of the Exchange Act based on allegedly false or misleading statements Defendants made relating to three different Celgene drugs—GED-0301, Otezla, and Ozanimod.

In December 2019, the district court granted in part and denied in part Defendants' motion to dismiss the complaint. The district court dismissed all of AMF's GED-0301 theory, and almost all of AMF's Otezla and Ozanimod theories.[1] The district court also dismissed the Section 20(a) claims in their entirety, as well as the claims against seven of the individual Defendants.

With respect to Ozanimod, AMF alleges that Defendants' statements that Celgene intended to and did submit a new drug application ("NDA") for Ozanimod in 2017 were misleading—even though Celgene did in fact the submit the NDA in 2017—because Celgene had identified an Ozanimod metabolite (a chemical byproduct created when the body breaks down a drug) (the "Metabolite") that required additional testing. AMF contends that, without that testing, the NDA was sure to be rejected by the Food and Drug Administration ("FDA"). According to

---

[1] The parties agree that only a single alleged Otezla misstatement remains in the case, but disagree as to the number of Ozanimod statements that remain.

AMF, the purportedly fraudulent nature of Defendants' statements was revealed on February 27, 2018, when Celgene announced that the FDA had refused to accept the Ozanimod NDA for filing, and also on April 29, 2018, when a Morgan Stanley analyst report predicted (incorrectly) that Celgene would not be able to resubmit the Ozanimod NDA for another 1 to 3 years because of the need for additional Metabolite testing.[2]  Ultimately, Celgene resubmitted the NDA on March 25, 2019, and the FDA approved the drug on March 25, 2020.

### B.    The District Court's Class Certification Ruling

Following the motion to dismiss ruling, AMF moved to certify a class for what little is left of its case.  AMF requested "a class consisting of all persons or entities who purchased the common stock of [Celgene] between April 27, 2017 and April 27, 2018 . . . and were damaged thereby."  Dkt. No. 90-1 at 1.[3]  The class period's proposed start date of April 27, 2017 was the date of the earliest alleged misstatement that survived the motion to dismiss.  The class period's proposed end date of April 27, 2018 was the last trading day before the April 29, 2018 Morgan Stanley analyst report speculating that there would a "1 to 3 year delay" before Celgene could refile the Ozanimod NDA.

---

[2] The price of Celgene's stock declined after each of these two announcements.

[3] Citations to Dkt. No. __ are to the district court docket.

Defendants argued that class certification should be denied because, among other reasons, AMF had failed to demonstrate by a preponderance of the evidence that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 483-84 (3d Cir. 2018). "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 810 (2011).

Although reliance is "traditional[ly]" an individualized issue that precludes class certification, *id.*, AMF argued that reliance was a common question principally because of the presumption set forth in *Basic*.[4] In *Basic*, the Supreme Court held that "securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton II*, 573 U.S. at 268 (citing *Basic*, 485 U.S. at 246). To invoke this presumption, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff

---

[4] AMF also briefly raised the presumption set forth in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), but this presumption did not factor into the district court's decision.

traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.*

In *Halliburton II*, the Supreme Court reiterated that the *Basic* presumption of reliance can be rebutted at the class certification stage, during which "'*[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.*'" *Id.* at 269 (quoting *Basic*, 485 U.S. at 248) (emphasis added and brackets removed).  For example, a defendant can rebut the *Basic* presumption by showing "that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'" *Id.* at 263-64, 269.

In this regard, AMF's own expert witness's event study demonstrated that there was no evidence of "front-end price impact"—*i.e.*, no statistically significant increase in the price of Celgene's stock associated with any of the alleged Ozanimod misstatements remaining in the case except for two.[5]  Given the lack of front-end price impact, AMF resorted to the so-called "price maintenance" theory.  Under this theory, "statements that merely maintain inflation already extant in a company's stock

---

[5] Defendants demonstrated that AMF lacked standing to pursue claims based on those two alleged misstatements, because both statements postdated AMF's last purchase of Celgene securities.  *See Winer Family Tr. v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).

price, but do not add to that inflation, nonetheless affect a company's stock price."
*Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017) (internal quotation marks
omitted). "In this circumstance, price impact is shown if, when the truth is revealed,
the artificial inflation in the stock price (maintained as a result of a repeated
misrepresentation) dissipated and the price of the stock fell"—known as "back-end
price impact." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580, 2019 WL
5287980, at *21 (S.D.N.Y. Oct. 18, 2019) (R&R), *adopted in relevant part*, 2020 WL
1329354 (S.D.N.Y. Mar. 23, 2020).

For the alleged Ozanimod misstatements, AMF claimed two "corrective
disclosures" following which the price of Celgene's stock declined—Celgene's
announcement on February 27, 2018 that the FDA had refused to accept the
Ozanimod NDA, and the Morgan Stanley analyst report on April 29, 2018,
speculating that there would be a 1-3 year delay in refiling the Ozanimod NDA.

In response, Defendants argued that, even under the price maintenance theory,
they had severed the link between the alleged Ozanimod misstatements and the April
29, 2018 Morgan Stanley report, because that report merely repackaged and analyzed
information that had already been disclosed. *See, e.g.*, *Meyer v. Greene*, 710 F.3d 1189,
1199 (11th Cir. 2013) ("repackaging of already-public information by an analyst or
short-seller is simply insufficient to constitute a corrective disclosure"); *In re Merck &
Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005) (report that merely analyzes
previously disclosed data that did not move the market "in the period immediately

following [its] disclosure" is not corrective); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 295 (D. Minn. 2018) (report that analyzed previously disclosed information but "did not present any new facts" was not corrective). Accordingly, under *Halliburton II*, Defendants rebutted the *Basic* presumption of reliance as to purchases of Celgene stock after the February 27, 2018 alleged corrective disclosure.

After noting that "[t]he Third Circuit has not addressed if a plaintiff that invokes the *Basic* presumption can rely on a price maintenance theory," Ex. A ("Op.") at 19, the district court allowed AMF to proceed on the theory and held that Defendants' showing was not enough to rebut the *Basic* presumption. Even though the Supreme Court in *Halliburton II* expressly held that "direct as well as indirect price impact evidence" can rebut the *Basic* presumption at the class certification stage, 573 U.S. at 283, the district court determined that Defendants had "the burden to prove a lack of price impact through *direct evidence*." Op. at 23 (emphasis in original). As the district court saw it, Defendants "merely attack[ed] Plaintiff's expert report," which was not sufficient without Defendants also "provid[ing] their own evidence demonstrating that the market had already reacted to" the previously disclosed information "or otherwise explain[ing] why the price drop occurred on April 30." *Id.*

This petition for permission to appeal now follows.[6]

## RELIEF SOUGHT

Defendants seek permission to "appeal from an order granting . . . class-action certification under [Rule 23]." Fed. R. Civ. P. 23(f).

## STANDARD OF REVIEW

This Court has "very broad discretion in deciding whether to grant permission to pursue a Rule 23(f) appeal." *Rodriguez*, 726 F.3d at 376 (quoting *Gutierrez v. Johnson & Johnson*, 523 F.3d 187, 192 (3d Cir. 2008)). This Court has articulated several non-exclusive circumstances under which Rule 23(f) review "is appropriate"—including, as relevant here, when "an appeal implicates novel or unsettled questions of law," when "the appeal might 'facilitate development of the law on class certification,'" or when "the district court's class certification determination was erroneous." *Id.* at 376-77 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164-65 (3d Cir. 2001)). Any one of these (or any other) factors can justify granting a Rule 23(f) petition, which can seek either to reverse or to modify a class certification ruling. *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) (considering cross-petitions to decertify or expand class), *abrogated on other grounds by Amgen, Inc. v. Conn. Ret. Plans*

---

[6] This petition is timely because it is being filed "within 14 days after the [class certification] order [was] entered" on November 30, 2020. Fed. R. Civ. P. 23(f).

*& Tr. Funds*, 568 U.S. 455 (2013); *Glover v. Standard Fed. Bank*, 283 F.3d 953 (8th Cir. 2002) (reversing order that expanded class).

Rule 23(f) review is particularly common in securities-fraud cases. *See, e.g.*, *Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019); *DVI*, 639 F.3d 623; *Malack v. BDO Seidman, LLP*, 617 F.3d 743 (3d Cir. 2010); *Newton*, 259 F.3d 154. Because "very few securities class actions are litigated to conclusion," the "review of . . . novel and important legal issue[s] may be possible only through the Rule 23(f) device." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002). Indeed, *Halliburton II* itself reviewed a class-certification ruling that had been initially appealed under Rule 23(f).

## REASONS FOR GRANTING THE PETITION

### I.    This Court Should Grant Review to Clarify the Application of the *Basic* Presumption After *Halliburton II*.

This case presents an excellent opportunity for this Court to construe—for the first time—the Supreme Court's 2014 decision in *Halliburton II*, which clarified when and how the *Basic* presumption of reliance may be rebutted. As in many securities-fraud cases, this question is central to whether common issues predominate over individual ones for purposes of Rule 23(b)(3). Review by this Court is necessary because district courts in this Circuit, including the district court here, have misunderstood what *Halliburton II* requires.

- 10 -

### A. The District Court Misapplied *Halliburton II*'s Instruction that "Any" Type of Evidence Can Rebut the *Basic* Presumption.

*Halliburton II* could not have been clearer about what type of evidence can rebut the *Basic* presumption: "'*Any showing* that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.'" *Halliburton II*, 573 U.S. at 269 (emphasis added) (brackets omitted) (quoting *Basic*, 485 U.S. at 248); *see also id.* at 279-80 ("*Basic* itself made clear that the presumption was just that, and could be rebutted by appropriate evidence, including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." (internal quotation marks omitted)). As the Supreme Court emphasized, "Defendants may seek to defeat the *Basic* presumption at [the class certification] stage through direct as well as indirect price impact evidence." *Id.* at 283.

Notwithstanding the Supreme Court's explicit guidance that "direct as well as indirect price impact evidence" can rebut the *Basic* presumption, *id.*, the district court determined that "a defendant 'bears the burden to prove a lack of price impact through *direct evidence*.'" Op. at 23. Apparently deeming Defendants' expert and documentary evidence to be "indirect," the district court ignored this evidence entirely. *See id.* (opining that "Defendants merely attack Plaintiff's expert report").

The district court's improper insistence on "direct evidence" rested on an earlier District of New Jersey decision that applied the same erroneous standard. *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-cv-5275, 2015 WL 5097883, at *12 (D.N.J. Aug. 31, 2015).[7]  Notably, in 2015, this Court granted a Rule 23(f) petition to review that earlier decision.  In seeking review, the defendants there argued—much as Defendants do here—that they should have been permitted to rebut the *Basic* presumption with evidence that "as of the date of the purported corrective disclosure, the market was already acutely aware of" the information supposedly revealed.  *See* Petition for Leave to Appeal at 13-14, *Prudential*, No. 15-8090 (3d Cir. Sept. 14, 2015).  But the case settled before this Court could rule.  *See* Order Dismissing Case, *Prudential*, No. 16-1090 (3d Cir. Nov. 8, 2016).  And this Court has not construed *Halliburton II* since.

As this Court was prepared to do in *Prudential*, it should step in here to resolve the confusion over what is required under *Halliburton II* to rebut the *Basic* presumption of reliance.  This issue remains "novel or unsettled" in this Circuit, its resolution would greatly "facilitate development of the law on class certification" in securities-

---

[7] The district court also cited *West Palm Beach Police Pension Fund v. DFC Global Corp.* No. 13-cv-6731, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016).  Op. at 23.  There, however, the district court found that the defendant "failed to provide a valid reason to discount" evidence of back-end price impact.  *DFC Glob.*, 2016 WL 4138613, at *14.  Here, Defendants presented affirmative evidence rebutting AMF's claim of back-end price impact.

fraud cases, and the district court's articulation of the standard "was erroneous."

*Rodriguez*, 726 F.3d at 376-77.

**B.    This Court Should Clarify What Burden Defendants Must Meet in Order to Rebut the *Basic* Presumption.**

Relatedly, this Court should also grant review to clarify whether defendants carry a burden of persuasion, or just a burden of production, for rebutting the *Basic* presumption. That issue is unsettled both in the district courts of this Circuit and among courts more broadly, and it is critically important to class certification in securities-fraud cases.

Here, the district court appeared to place a burden of persuasion on Defendants—holding that "a defendant bears the burden to *prove* a lack of price impact." Op. at 23 (emphasis added) (internal quotation marks omitted). Under Federal Rule of Evidence 301, however, "unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of *producing* evidence to rebut the presumption," but not a "burden of *persuasion*, which remains on the party who had it originally." Fed. R. Evid. 301 (emphasis added). Indeed, as per *Halliburton II*, "[t]he *Basic* presumption does not relieve plaintiffs of the burden of proving—before class certification—that" there are "common issues of reliance [that] predominate over individual ones," 573 U.S. at 275-76.[8] Courts within

---

[8] *Basic* itself cited Rule 301 when explaining that presumptions are "useful devices for allocating the burdens of proof between parties." 485 U.S. at 245.

and outside this Circuit disagree on whether, given this authority, defendants must *persuade* the court of a lack of price impact, or merely *produce* evidence of its absence.

Some courts properly impose only a burden of production. *See, e.g.*, *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016); *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 343-44 (D.N.J. 2018). This burden can be met by producing "enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'" *Bing Li*, 324 F.R.D. at 344 (quoting *Lupyan v. Corinthian Colls., Inc.*, 761 F.3d 314, 320 (3d Cir. 2014)); *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74 (D.N.J. 2019) (same, quoting *Bing Li*). As this Court has explained, even a "single, non-conclusory affidavit or witness's testimony" can "destroy[] [a] presumption," leaving the court to evaluate the parties' competing evidence "to determine the ultimate question at issue" without reference to the presumption. *Lupyan*, 761 F.3d at 320-21 (internal quotation marks omitted).

Other courts, however—like the district court here—improperly impose a burden of persuasion on defendants seeking to rebut the *Basic* presumption. *See, e.g.*, *Waggoner*, 875 F.3d at 99-103; *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 610 (7th Cir. 2020) (citing *Waggoner*); *Prudential*, 2015 WL 5097883, at *12. To the degree these courts address Rule 301 at all, they insist that the *Basic* presumption has "a sufficient link" to the "federal securities laws" to qualify as statutory, and that the *Basic* presumption would be too easily overcome if it did not shift the burden of persuasion. *Waggoner*, 875 F.3d at 100-01, 103.

- 14 -

Review under Rule 23(f) is needed to clarify the appropriate standard in this Circuit. Indeed, the Supreme Court just granted certiorari on this and one other question in *Goldman Sachs Group v. Arkansas Teacher Retirement System*—underscoring the importance of this issue, as well as how courts need guidance on it. *See* Order List, 592 U.S. __, (U.S. Dec. 11, 2020).[9]

## II.    The District Court's Decision Was Erroneous.

This Court should also grant review because the decision below was "erroneous," *Rodriguez*, 726 F.3d at 377, for reasons beyond just the district court's incorrect legal standards set forth above.

The district court's class-certification ruling rested on the price maintenance theory and, for Ozanimod, on the proposition that corrective disclosures were made both on February 27, 2018, when Celgene announced that the Ozanimod NDA had not been accepted, and on April 29, 2018, when Morgan Stanley opined on the possible timeline for the NDA's resubmission. By treating these disclosures as corrective of the alleged fraud, Plaintiffs argued, and the district court agreed, that Defendants' earlier alleged misstatements had back-end price impact—namely, a drop in Celgene's stock price after each purportedly corrective disclosure. Under this theory, in other words, Morgan Stanley's prediction of delay caused Celgene's stock

---

[9] Notably, the district court's class certification order relied on the decision below in *Goldman Sachs*. *See* Op. at 23-24 (citing *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n.18 (2d Cir. 2020)).

price to drop by revealing the truth purportedly concealed by Defendants' alleged misstatements regarding the Ozanimod NDA.

But if the district court had not ignored Defendants' evidence that the market was *already aware* of the supposedly corrective information—apparently because the court believed this evidence was "indirect"—that evidence would have easily rebutted the *Basic* presumption. That is especially so if the district court had properly applied the law of presumptions and imposed only a burden of production.

Under *Halliburton II*, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price" is enough to rebut the *Basic* presumption. 573 U.S. at 281. One way of "sever[ing] the link," *id.*, when the plaintiff relies on the price maintenance theory is to break the connection between the alleged misstatements and the supposedly corrective disclosure by showing that the latter did not disclose facts that corrected the alleged misstatement. To that end, many courts have held that "expert analysis" of previously disclosed facts is not a corrective disclosure. *Meyer*, 710 F.3d at 1199; *see also, e.g.*, *In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2009) (same, as to "negative journalistic characterization of previously disclosed facts"); *Medtronic*, 325 F.R.D. at 295 (same, as to "analysts' reports" that "did not present any new facts to the market"); *Chi. Bridge*, 2019 WL 5287980, at *23 (same, as to "speculative or negative commentary"); *Stein v. Tangoe, Inc.*, No. 13-cv-286, 2014

- 16 -

WL 12767210, at *22-24 (D. Conn. Sept. 30, 2014) (same, as to "a mere negative recharacterization of already public information").

Here, the only portion of the April 29 Morgan Stanley report that AMF alleged or argued was "new" and therefore corrective was the prediction "that the Ozanimod NDA would be delayed by one to three years because of the need for additional testing." Dkt. No. 99 at 23 (internal quotation marks and brackets omitted); *see* Dkt. No. 57 ("Compl.") ¶ 502. But that estimated timeline—which Morgan Stanley shortened significantly only three days later—was neither new nor based on newly disclosed information and thus cannot have been corrective.

By the time Morgan Stanley predicted a 1-3 year delay in the NDA's resubmission on April 29, several analyst reports from Morgan Stanley and others had *already* predicted a multiyear delay in the NDA's timing. *See* Dkt. No. 95-21 (Morgan Stanley 4/26/18 Report #2) at 2 (noting possible "2-3 year delay until refiling"); Dkt. No. 95-23 (Jefferies 4/26/18 Report) at 1 (noting possible filing delay of "1-2 years); Dkt. No. 95-24 (RBC Capital Markets 4/26/18 Report) at 1 (suggesting "~1 year delay").

Moreover, even if there had been anything new in Morgan Stanley's April 29 prediction of a 1-3 year delay, that prediction rested exclusively on previously disclosed information. In particular, Morgan Stanley relied solely on (i) Celgene's identification of the Metabolite; (ii) Morgan Stanley's "prior review of FDA guidance on metabolites"; (iii) posters presented at American Academy of Neurology ("AAN")

- 17 -

annual meetings in 2013 and 2014, which Morgan Stanley described as "previously published . . . results and studies" about animal exposure to Ozanimod metabolites; and (iv) an SEC filing. Dkt. No. 95-16 (Morgan Stanley 4/29/18 Report) at 1-3. As AMF has never disputed, all of this information had previously been disclosed publicly.

AMF itself alleged that Celgene disclosed the Metabolite's existence and identity at an AAN annual meeting on Wednesday, April 25, 2018, along with the fact that the Metabolite was responsible for approximately 90% of the effect of Ozanimod and "that the Metabolite levels were much lower in the animal species used in the non-clinical studies than in humans." Compl. ¶ 495. As Defendants presented to the district court, multiple analyst reports throughout the rest of that week discussed the Metabolite's existence and low levels in animal trials—all in advance of Morgan Stanley's purportedly corrective April 29 report. *See* Dkt. No. 94-2 (Gompers Expert Report) at ¶¶ 43-52;[10] Dkt. No. 95-20 (Morgan Stanley 4/26/18 Report #1) at 1; Dkt. No. 95-21 (Morgan Stanley 4/26/18 Report #2) at 1-2; Dkt. No. 95-22 (Guggenheim

---

[10] Although this document was initially lodged under seal, the parties' subsequent motion to seal did not request that this document remain sealed, and the district court ordered sealing only as to the documents the parties had requested. *See* Dkt. Nos. 106, 106-1, 109.

4/26/18 Report) at 1; Dkt. No. 95-23 (Jefferies 4/26/18 Report) at 1; Dkt. No. 95-24 (RBC Capital Markets 4/26/18 Report) at 1.[11]

Defendants also presented evidence that all of the remaining information cited in Morgan Stanley's April 29 report had already been disclosed. Morgan Stanley's "prior review of FDA guidance on metabolites" had been disclosed in one of its own prior reports. Dkt. No. 95-21 (Morgan Stanley 4/26/18 Report #2) at 1. The SEC filing cited in Morgan Stanley's report was also public. Dkt. No. 95-25 (SEC filing). And AMF's own expert admitted that the posters presented at the AAN annual meetings in 2013 and 2014—earlier instances of the same meeting at which Celgene disclosed the Metabolite in 2018—were also previously disclosed. Dkt. No. 94-15 (Tabak Dep.) at 24-25.[12] Indeed, the purportedly corrective April 29 report (issued on a Sunday) stated that Morgan Stanley was able to locate the posters "over the weekend" and even included hyperlinks to them. Dkt. No. 95-16 (Morgan Stanley 4/29/18 Report) at 1.[13]

---

[11] Moreover, Defendants' evidence showed that some analysts had anticipated the existence of a significant metabolite months before Celgene's announcement. Dkt. No. 95-18 (RBC Capital Markets 2/27/18 Report); Dkt. No. 95-19 (Evercore 2/28/18 Report).

[12] This document was also initially lodged under seal, but not subsequently requested to be sealed by either party or ordered sealed by the district court. *See* Dkt. Nos. 106, 106-1, 109.

[13] Despite AMF's characterization of these posters as requiring "detailed review of certain obscure data," Compl. ¶¶ 499-500, all that Morgan Stanley purportedly deduced from the posters was that "exposure of [the Metabolite] in animal models was likely below a relevant human therapeutic dose," Dkt. No. 95-16 (Morgan Stanley

The April 29 Morgan Stanley report was thus simply an analyst's opinion that was based on previously disclosed facts.  In an efficient market, where material information "is immediately incorporated into stock prices," *United States v. Schiff*, 602 F.3d 152, 174 (3d Cir. 2010),[14] such a report cannot be a corrective disclosure.  *See, e.g., Meyer*, 710 F.3d at 1199; *Omnicom*, 597 F.3d at 512; *Medtronic*, 325 F.R.D. at 295; *Chi. Bridge*, 2019 WL 5287980, at *23; *Stein*, 2014 WL 12767210, at *22-24.  Indeed, only three days after issuing its April 29 report, Morgan Stanley *revised* its prediction of a 1-3 year delay in refiling the Ozanimod NDA—publishing a follow-up report that shortened its predicted delay to "1-1.5yrs."  Dkt. No. 95-26 (Morgan Stanley 5/2/18 Report) at 1.  Moreover, neither prediction was ultimately correct, as Celgene actually resubmitted the Ozanimod NDA less than a year after the Morgan Stanley reports.

All of this evidence should have sufficed to "sever the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff." *Halliburton II*, 573 U.S. at 281.  At the very least, this evidence created a genuine dispute of material fact on the matter.  That should have been enough to rebut the *Basic* presumption—which, in turn, defeats predominance for any purchases of Celgene

---

4/29/18 Report) at 2.  But the market already knew that, as reflected by multiple reports citing the low levels of the metabolite in animal trials as the reason the Metabolite was not discovered earlier. *E.g.*, Dkt. No. 95-20 (Morgan Stanley 4/26/18 Report #1) at 1.

[14] The parties agree that Celgene's stock traded in an efficient market at all relevant times.

stock made after February 27, 2018, AMF's previous alleged corrective disclosure. *See id.* at 281-82 ("[W]ithout the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)."). Particularly given the uncertainty in the law, with this Court having never addressed how the *Basic* presumption should be applied after *Halliburton II*, this Court should grant review to correct these errors.

Finally, the Court should also grant review because the district court erroneously rejected Defendants' arguments that (i) Defendants rebutted the *Basic* presumption of reliance for purchases after Celgene's February 27, 2018 announcement of the FDA's refusal to file the Ozanimod NDA by showing that that announcement was fully corrective; (ii) AMF is an atypical and inadequate class representative because of its spoliation of evidence; and (iii) AMF is atypical and inadequate because it lacks standing for some of the alleged misstatements. *See* Op. at 8-14, 22-23.

## CONCLUSION

For the foregoing reasons, Defendants' Rule 23(f) petition for permission to appeal should be granted.

Dated: December 14, 2020                                    Respectfully submitted,

                                                            */s/ Rajeev Muttreja*

Matthew J. Rubenstein                                       Robert C. Micheletto
JONES DAY                                                   Nina Yadava
90 South Seventh St.                                        Rajeev Muttreja
Suite 4950                                                  JONES DAY
Minneapolis, MN 55402                                       250 Vesey St.
Tel.: (612) 217-8800                                        New York, NY 10281
Fax: (844) 345-3178                                         Tel.: (212) 326-3939
mrubenstein@jonesday.com                                    Fax: (212) 755-7306
                                                            rmuttreja@jonesday.com

## CERTIFICATE OF COMPLIANCE AND BAR MEMBERSHIP

I, Rajeev Muttreja, hereby certify that:

1.      This document complies with the word limit of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the parts of the document exempted by Appellate Rule 32(f), it contains no more than 5,200 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Appellate Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond type.

Moreover, I further certify pursuant to this Court's Local Appellate Rules 28.3(d) and 46.1(e), that I, Rajeev Muttreja, as the signatory on the foregoing document, was admitted to the Bar of this Court on December 15, 2015, and am a member in good standing with the Bar of this Court.

Dated:  December 14, 2020                     Respectfully submitted,


                                                              /s/ Rajeev Muttreja
                                                              Rajeev Muttreja

                                                              *Attorney for Defendants-Petitioners*

# CERTIFICATE OF SERVICE

I, Rajeev Muttreja, hereby certify that on December 14, 2020, the foregoing

Petition for Permission to Appeal under Federal Rule of Civil Procedure 23(f), and

the accompanying Exhibits, and other certificates of counsel, were sent via email and

UPS to the below-listed counsel for Plaintiff-Respondent, as required by Federal

Rules of Appellate Procedure 5(A)(1) and 25(c)-(d), and this Court's Local Appellate

Rule 25.1 and Miscellaneous Local Appellate Rule 113.4(b).

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO,
P.C.
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

SEEGER WEISS, LLP
Christopher A. Seeger
55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com

*Co-Liaison Counsel for Lead Plaintiff and
the Class*

KESSLER TOPAZ
MELTZER & CHECK, LLP
Andrew L. Zivitz
Matthew L. Mustokoff
Joshua E. D'Ancona
Margaret E. Mazzeo
Nathan A. Hasiuk
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jdancona@ktmc.com
mmazzeo@ktmc.com
nhasiuk@ktmc.com
*Lead Counsel for Lead Plaintiff and
the Class*

- 24 -

- 25 -

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP
Salvatore J. Graziano
Adam H. Wierzbowski
Brenna D. Nelinson
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
salvatore@blbglaw.com
adam@blbglaw.com
brenna.nelinson@blbg.com
*Additional Counsel for the Class*

Dated:  December 14, 2020

Respectfully submitted,

/s/ Rajeev Muttreja
Rajeev Muttreja

*Attorney for Defendants-Petitioners*

# EXHIBIT A

<u>Not for Publication</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr>
<td>

*In re* CELGENE CORPORATION
SECURITIES LITIGATION

</td>
<td>

Civil Action No. 18-4772

**<u>OPINION</u>**

</td>
</tr>
</table>

**<u>John Michael Vazquez, U.S.D.J.</u>**

This class action concerns allegations of securities fraud. Lead Plaintiff AMF Pensionsforsakring, AB ("AMF" or "Plaintiff") asserts that Defendant Celgene Corporation ("Celgene") and several of its key officers and/or employees engaged in fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* D.E. 57. The allegations pertain to public statements concerning two drugs in Celgene's new drug pipeline. Currently pending before the Court is Plaintiff's motion for class certification pursuant to Federal Rule of Civil Procedure 23. D.E. 90. The Court reviewed the parties' submissions in support and in opposition[1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Plaintiff's motion is **GRANTED**.

## I. INTRODUCTION

### A. Factual Background

As the parties are familiar with this matter, the Court does not provide a detailed factual recitation. Instead, the Court reviews relevant facts here and discusses certain additional facts in the analysis section below.

---

[1] Plaintiff's moving brief will be referred to as "Plf. Br.," D.E. 90-1; Defendants' opposition will be referred to as "Defs. Opp," D.E. 95; and Plaintiff's reply will be referred to as "Plf. Reply," D.E. 99.

Celgene is a biopharmaceutical company that primarily develops and commercializes drugs for the treatment of cancer and inflammatory diseases.[2] SAC ¶ 64. Celgene manufactures and sells the multiple myeloma drug Revlimid, which in 2010, accounted for approximately seventy percent of Celgene's total annual product sales. *Id.* ¶ 99. Revlimid's patent expires in 2022. *Id.* ¶ 101. Plaintiff alleges that Defendants made material misrepresentations and omissions about two drugs, Otezla and Ozanimod, that Celgene touted as products to meet the anticipated revenue drop following the Revlimid patent expiration.[3]

Months before the Otezla launch in 2014, "Defendants primed the market that Otezla sales were poised to sky-rocket, representing that Otezla net product sales would reach $1.5 billion to $2 billion by 2017." *Id.* ¶¶ 205-06. In a January 12, 2015 press release, Celgene set out its five-year strategic growth plan, including the 2017 projections. *Id.* ¶ 207. Throughout 2015 and 2016, Defendants represented that Celgene was on-track to meet the 2017 sales projection. *Id.* ¶¶ 231-33. As early as July 2016, however, Defendants purportedly received explicit warnings that the 2017 projection was unattainable. *Id.* ¶ 234. Publicly, however, Defendants continued to reaffirm the 2017 target. *Id.* ¶ 242.

On October 26, 2017, Celgene "stunned the market by announcing that, in light of the dismal Otezla sales numbers, the Company had slashed the 2017 guidance by more than $250 million" and lowered the 2020 Inflammatory & Immunology ("I&I") guidance by over $1 million.

---

[2] The facts are derived from Plaintiff's Second Amended Complaint (the "SAC"). D.E. 57.

[3] In the SAC, Plaintiff asserted securities fraud claims based on misrepresentations and omissions as to a third drug, GED-0301. Following Defendants' motion to dismiss, the Court determined that Plaintiff failed to state a claim with respect to GED-0301. Dec. 19 Opinion at 24-28. While Plaintiff was granted leave to file an amended complaint to address the identified deficiencies, including those pertaining to GED-0301, D.E. 76, Plaintiff did not do so. As a result, Plaintiff's claims regarding GED-0301 are dismissed with prejudice. D.E. 76.

*Id.* ¶ 264. After this announcement, the price of Celgene common stock declined more than 16%; from $119.56 per share on October 25, 2017 to $99.99 per share on October 26, 2017. *Id.* ¶ 269.

Ozanimod is another product in Celgene's I&I pipeline, and was initially developed by a different company, Receptos. *Id.* ¶ 270. On July 14, 2015, Celgene purchased Receptos for $7.2 billion. In announcing the acquisition, Celgene "projected annual Ozanimod sales of up to $6 billion." *Id.* ¶ 271. Ozanimod was not approved by the U.S. Food and Drug Administration ("FDA") when Celgene acquired Receptos, but Celgene anticipated filing a New Drug Application ("NDA") for Ozanimod with the FDA in 2017. *Id.* ¶¶ 275-79.

Through a Phase I trial that Celgene started in October 2016, Celgene identified a metabolite named CC112273 (the "Metabolite"), "which triggered the need for the additional testing described in the FDA guidance" before FDA approval. *Id.* ¶¶ 51, 297-98. Despite the need for additional testing after discovery of the Metabolite, Defendants continued to represent that Celgene was on track to submit the NDA before the end of 2017 and failed to disclose information about the Metabolite. *See, e.g.*, *id.* ¶¶ 307, 308, 315. Even after the FDA expressly informed Celgene that it needed to include the Metabolite testing results with its NDA submission, Celgene continued to move forward with its plan to submit the NDA in December 2017 without the Metabolite study results. *Id.* ¶ 318.

Celgene submitted the Ozanimod NDA in December 2017 as planned. *Id.* ¶ 319. After submitting the NDA, Celgene issued a press release on January 8, 2018 stating that it expected an FDA decision on the NDA in 2018. *Id.* ¶ 322. On February 27, 2018, Celgene disclosed that it received a refuse to file ("RTF") letter from the FDA in response to the Ozanimod NDA submission. An RFT letter indicates that the FDA "identifie[d] clear and obvious deficiencies" in the NDA. *Id.* ¶¶ 323-24. As a result of the RFT announcement, Celgene's common stock fell

3

from \$95.78 per share on February 27, 2018 to \$87.12 per share on February 28, 2018. *Id.* ¶ 330. Then on April 29, 2017, Plaintiff alleges that the market learned through a Morgan Stanley report that additional testing on the Metabolite was required, which could delay the refiling of the Ozanimod NDA by up to three years. *Id.* ¶ 332. Celgene's common stock fell again, from \$95.78 per share on April 27, 2018 to \$87.10 per share on April 30, 2018. *Id.*

### B. Procedural History

Plaintiff the City of Warren General Employees' Retirement System filed the initial putative class action complaint in this matter on March 29, 2018. D.E. 1. On September 26, 2018, this Court consolidated two related cases; appointed AMF as the Lead Plaintiff; and appointed class counsel. D.E. 36. AMF then filed the SAC on February 27, 2019, alleging (i) violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and (ii) violations of Section 20(a) of the Exchange Act against Defendants Alles, Kellogg, Smith, Curran, Hugin, and Fouse. D.E. 57.

On February 8, 2019, Defendants filed their motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). D.E. 52. The Court then entered an Opinion and Order granting in part and denying in part Defendants' motion to dismiss (the "Dec. 19 Opinion"). D.E. 75, 76. The Court dismissed Plaintiff's Section 20(a) claim and narrowed the Section 10(b) and Rule 10b-5 claim, as it determined that many of the alleged misrepresentations and omissions were not actionable. The Court discusses specifically which alleged misrepresentations and omissions remain after the December 19 Opinion in the analysis section below, as the parties appear to disagree over the scope of the December 19 Opinion.

Plaintiff subsequently filed the instant motion to certify a class. D.E. 90.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."  *Id.* at 590 (citing Fed. R. Civ. P. 23(a)-(b)).   Plaintiff first bears the burden of showing that the proposed class satisfies the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  These four prongs are often referred to as numerosity, commonality, typicality, and adequacy.  *See, e.g., Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 165 (3d Cir. 2013).

Plaintiff must also show that proposed class satisfies Rule 23(b)(1), (b)(2), or (b)(3).  *Marcus*, 687 F.3d at 590.  Here, Plaintiff argues that the putative class meets the requirements of Rule 23(b)(3).  Under Rule 23(b)(3), a plaintiff must show the following:

> [Q]uestions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

5

Pursuant to Rule 23(c)(1)(A), a court "must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). The decision to certify a class or classes is left to the discretion of the court. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), *as amended* (Jan. 16, 2009). "[T]he requirements set out in Rule 23 are not mere pleading rules." *Marcus*, 687 F.3d at 591 (alteration in original) (quoting *Hydrogen Peroxide*, 552 F.3d at 316). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Id.* "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *Hydrogen Peroxide*, 552 F.3d at 318.

The Third Circuit emphasizes that "'[a]ctual, not presumed[,] conformance' with Rule 23 requirements is essential." *Marcus*, 687 F.3d at 591 (alterations in original) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). "To determine whether there is actual conformance with Rule 23, a district court must conduct a 'rigorous analysis' of the evidence and arguments put forth." *Id.* (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). This "rigorous analysis" requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action." *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 307, 316). Therefore, a district court "may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'" *Hydrogen Peroxide*, 552 F.3d at 320 (quoting *Newton*, 259 F.3d at 167).

## III. ANALYSIS

### A. Rule 23(a) Requirements

#### 1. Numerosity

"No single magic number exists" to meet the numerosity requirement. *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 139 (D.N.J. 2009) (quotation omitted). Yet, "the Third Circuit has previously held that the numerosity requirement will generally be satisfied 'if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40.'" *Id.* (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

Plaintiff contends that during the Class Period, Celgene's securities traded on the NASDAQ and there were approximately 775 million shares of outstanding common stock. Plf. Br. at 12. Moreover, 1,800 institutional investors purchased or otherwise acquired Celgene common stock during this time. *Id.* Defendants do not address numerosity. The Court finds that Plaintiff satisfies the numerosity requirement.

#### 2. Commonality

"Rule 23(a)(2) requires Plaintiffs to demonstrate that 'there are questions of law or fact common to the class.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018) (quoting Fed. R. Civ. P. 23(a)(2)). However, Rule 23(a)(2)'s "language is easy to misread, since any competently crafted class complaint literally raises common questions." *Id.* at 487 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation omitted)). "A complaint's mere recital of questions that happen to be shared by class members" is insufficient; instead, "'[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury.'" *Id.* (alterations in original) (quoting *Dukes*, 564 U.S. at 349-50) (internal quotation omitted). "What matters . . . is not the raising of common 'questions' . . . but, rather the

7

capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). In other words, Plaintiff's claims "must depend upon a common contention" whereby "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Courts in this Circuit have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74-75 (D.N.J. 2019) (quoting *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018)) (internal punctuation omitted).

Plaintiff argues that there are numerous common questions here, including whether Defendants made material misrepresentations or omissions, and if Defendants acted with scienter when making the alleged statements. Further, Plaintiff maintains that resolution of these common questions will drive the overall course of the litigation. Plf. Br. at 13-14. Defendants also do not contest the commonality requirement. The Court is satisfied that Plaintiff satisfies the commonality requirement.

### 3. Typicality

"[T]ypicality demands that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Newton*, 259 F.3d at 185 (quoting Fed. R. Civ. P. 23(a)(3)). In other words, a lead plaintiff's claims must be "comparably central" to the claims of the absent parties. *Id.* at 183. This ensures that "the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *Id.* at 182-83 (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)).

The typicality requirement is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Id.* at 183. At the same time, all plaintiffs are not required to share identical factual circumstances – the requirement only mandates that a named plaintiff's individual circumstances cannot be "markedly different" from the other class members. *Id.* "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Id.* at 183-84. For example, "a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice." *Id.* at 184 (citing *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994)). The typicality requirement "does not mandate that all putative class members share identical claims, because even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Id.* (internal quotations and citations omitted).

Plaintiff maintains that typicality is satisfied here because it, and the other class members, assert the same claims under federal securities laws due to the same allegedly wrongful conduct by Defendants - that Defendants made material misrepresentations and omissions regarding Ozanimod and Otezla. In addition, Plaintiff contends the entire class was damaged by this wrongdoing because it caused class members to purchase Celgene common stock at artificially inflated prices. Plf. Br. at 15. Defendants do not address typicality. The Court determines that the typicality requirement is satisfied.

9

### 4. Adequacy

In reviewing the adequacy requirement, a court must decide whether the class representative "has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Sapir v. Averback*, No. 14-07331, 2015 WL 858283, at *3 (D.N.J. Feb. 26, 2015) (citing *Falcon*, 457 U.S. at 157 n. 13). "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). Adequacy functions as a "catch-all requirement" that "tend[s] to merge with the commonality and typicality criteria of Rule 23(a)." *Newton*, 259 F.3d at 185 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "Whether a party adequately represents a class depends on all the circumstances of the particular case." *Wetzel*, 508 F.2d at 247.

Defendants do not dispute that class counsel is adequate, but rather, contend that Plaintiff is an inadequate Lead Plaintiff do to certain unique defenses. Turning first to class counsel, Kessler Topaz is skilled and has experience with securities fraud litigation. Class counsel is adequate.

As for Defendants' contention that Plaintiff is an inadequate lead plaintiff, Defendants first argue that Plaintiff should be disqualified as lead plaintiff because of its spoliation of critical evidence. Defs. Opp. at 10-17. Federal Rule of Civil Procedure 37(e) governs the preservation of electronically stored information ("ESI") and provides that a court may issue sanctions if a party fails to preserve such evidence. Fed. R. Civ. P. 37(e). Pursuant to Rule 37(e), a court must first determine whether spoliation occurred, and then should address an appropriate sanction. *Goldrich v. City of Jersey City*, No. 15-885, 2018 WL 4492931, at *7 (D.N.J. July 25, 2018). To establish

10

spoliation, the party seeking sanctions must demonstrate that "the evidence was in the [offending] party's control, the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve evidence was reasonably foreseeable to the party." *Eisenband v. Pine Belt Auto., Inc.*, No. 17-8549, 2020 WL 1486045, at *7 (D.N.J. Mar. 27, 2020) (quoting *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 74 n. 5 (3d Cir. 2012)). To impose sanctions due to a party's spoliation, "the Court must find either prejudice to [the moving party] or that [the offending party] acted with the intent to deprive [the moving party] of the ESI's use in the litigation." *Goldrich*, 2018 WL 4492931, at *7.

Here, Defendants' spoliation argument is based on the fact that when Plaintiff's initial corporate designee left his job at AMF after litigation had commenced, Plaintiff deleted the designee's email box. Defs. Opp. at 11. According to Plaintiff, after Plaintiff received a litigation hold notice in approximately May or June 2016, Plaintiff took internal steps to maintain relevant documents. Decl. of James E. Cecchi ("Cecchi Decl."), Ex. 1 at T153:21-155:2 (June 10, 2020). Despite these internal steps, Plaintiff learned in 2020 that the designee's email account had been deleted and Plaintiff could not recreate the contents of the email box after learning about the deletion. *Id.* at T155:3-11.

Defendants fail to demonstrate that Plaintiff acted with the intent to deprive Defendants of ESI. Accordingly, assuming spoliation, Defendants must establish that they were prejudiced. *Goldrich*, 2018 WL 4492931, at *7. "Courts have found prejudice exists where documents that are relevant to a claim are unreviewable and the moving party has come forward with a plausible, good faith suggestion as to what the evidence might have been." *Id.* at *10; *see also Percella v. City of Bayonne*, No. 14-3695, 2020 WL 6559203, at *11 (D.N.J. Nov. 9, 2020) ("When a party moving for spoliation cannot offer 'plausible, concrete suggestions as to what the lost evidence

11

might have been,' there should be no finding of prejudice." (quoting *GN Netcom, Inc. v. Platronics, Inc.*, 930 F.3d 76, 83-85 (3d Cir. 2019))).

Defendants contend that they have been prejudiced because the destroyed emails "could have supplied a strong defense to certification" and that they have been deprived of the ability to fully disprove AMF's typicality and adequacy in connection with the motion for class certification. Defs. Opp. at 15. But outside of speculation, Defendants fail to plausibly identify any relevant information that was likely destroyed. Defendants, therefore, fail to meet their burden of establishing prejudice. Without prejudice, spoliation sanctions are not appropriate here. Moreover, without prejudice, the Court will not conclude that Plaintiff is an inadequate class representative because it inadvertently deleted an email account of a departing employee.

Defendants also argue that Plaintiff lacks standing to assert its claims as they pertain to Ozanimod because its last purchase of Celgene common stock occurred before any Defendant made an alleged wrongful statement about the drug. As a result, Defendants continue, Plaintiff is not an adequate class representative. Defs. Opp. at 22. A plaintiff alleging securities fraud "cannot rely on statements made subsequent to [its] purchase . . . because [a plaintiff[] could not have relied on the statements in making [its] purchase in the first place." *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 565 (D.N.J. June 2, 1992). Thus, a lead plaintiff does not have standing to assert Section 10(b) and Rule 10b-5 claims based on statements made after its purchase. *Winer Family Trust v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007).

Defendants' argument is based on an incorrect reading of the December 19 Opinion. In its discussion about whether Plaintiff sufficiently alleged actionable statements about Ozanimod, the Court specifically discussed statements that occurred on October 26 and 28, 2017. Dec. 19 Opinion at 38-39. Defendants interpret the Court's discussion as limiting Plaintiff's Ozanimod

12

claims solely to these statements. Defs. Opp. at 22. Consequently, because Plaintiff's final purchase of Celgene common stock occurred on October 12, 2017, Am. Compl., Ex. A, D.E. 40-1, Defendants maintain that Plaintiff lacks standing because the only actionable statements occurred after Plaintiff's purchases, Defs. Opp. at 22. But the Court's use of the signal "*See, e.g.,*" in its discussion of actionable statements demonstrates that the October statements were merely examples; they are not the *only* actionable statements.

In the December 19 Opinion, the Court determined[4] that "at a minimum," Defendants Tran and Martin knew, by April 2017, about the Metabolite and that additional testing was necessary. The Court also determined that because of Tran and Martin's knowledge, Plaintiff established scienter for Smith. Dec. 19 Opinion at 44. Thus, by April 2017, statements attributable to Tran, Martin, and Smith were actionable.[5] *Id.* at 38-39, 44. And in the SAC, Plaintiff sufficiently alleges that Smith made material misrepresentations, or "half-truths" between April 2017 and October 12, 2017. *See* FAC ¶¶ 432, 443-44. During a call discussing Celgene's first quarter financial results, Smith presented a slide that "touted 'Advancing Ozanimod Development Programs'" and stated that Celgene would submit its NDA" in 2017. *Id.* ¶ 432. As discussed, because Smith was discussing the Ozanimod NDA, his failure to discuss the Metabolite and the need for additional testing was misleading. Dec. 19 Opinion at 38-39. Smith made similar non-forward-looking statements during a conference call on July 27, 2017. SAC ¶¶ 443-444. For the same reasons as

---

[4] To be clear, the Court did not, and is not, making any dispositive factual findings. Instead, in the Dec. 19 Opinion, the Court assumed the truth of all well-pleaded allegations and gave Plaintiff the benefit of all reasonable inferences to be drawn from those allegations. The Court does the same here.

[5] It could reasonably be inferred that Smith was aware approximately around the same time as Martin, because Martin reported to Smith. Smith also made an actionable statement in July 2017. The July 2017 statement is sufficient to convey Plaintiff with standing.

13

discussed for Smith's April 2017 statement, this statement is also actionable.[6] Accordingly, Plaintiff has standing to assert its Ozanimod claims.[7] Plaintiff satisfies the adequacy requirement.

For the foregoing reasons, the Court concludes that the Rule 23(a) requirements are met in this matter. The Court now turns to its Rule 23(b) analysis.

### B. Rule 23(b)(3) Requirements

As discussed, Plaintiff seeks to certify its class pursuant to Rule 23(b)(3). The requirements for Rule 23(b)(3) class certification are that "the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 564 U.S. at 362 (emphases added) (citing Fed. R. Civ. P. 23(b)(3)). These elements are commonly referred to as the "predominance" and "superiority" requirements. *Id.* The Third Circuit has also recognized that "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015).

---

[6] Defendants argue that AMF does not sufficiently allege that Smith's July comment was made in connection to the NDA filing. Defs. Opp. at 20 n. 10. But Plaintiff alleges that after Curran presented a slide stating that Celgene anticipated filing the NDA by year end, SAC ¶ 442, Smith stated "just to add on to the comments, we feel very, very good about the data that's emerging for ozanimod and looking forward to getting it out," *id.* ¶ 443. As pled, it appears that Smith's comment was made in reference to the NDA; at a minimum, such an inference is reasonable. Defendants are improperly viewing Smith's statements in isolation rather than reading the pleading as a whole.

[7] Plaintiff also contends that it has standing based on official company statements in SEC filings and press releases issued beginning in April 2017. Plf. Reply at 15-16. It is not clear whether scienter can be imputed to a corporation without first establishing scienter for a specific individual. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n. 6 (3d Cir. 2018) (explaining that the circuit has "neither accepted nor rejected" the doctrine of corporate scienter, which "allows a plaintiff to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant" (internal citation omitted)). Because Plaintiff has standing via Smith's statements, the Court does not address this argument.

14

### 1. Predominance

The predominance requirement is "a 'far more demanding' standard than the commonality requirement of Rule 23(a)." *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) (quoting *Amchem Prods.*, 521 U.S. at 624). It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "Predominance turns on the 'nature of the evidence' and whether 'proof of the essential elements of the cause of action requires individual treatment.'" *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016) (quoting *Hydrogen Peroxide*, 552 F.3d at 311).

"At the class certification stage, the predominance requirement is met only if the district court is convinced that 'the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *Gonzalez*, 885 F.3d at 195 (internal quotation omitted)). To assess this requirement, district courts "must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove' those elements." *Id.* at 128 (quoting *Marcus*, 687 F.3d at 600).

In this instance, Plaintiff seeks class certification on its Section 10(b) and Rule 10b-5 claim. To establish its securities claims, Plaintiff must establish "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic

loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Plaintiff asserts that scienter, materiality, falsity of the alleged actionable statements and loss causation are issues common to the class. Plf. Br. at 20. Defendants do not appear to dispute this point. "[A] failure of proof" on any of these issues would end the case for all class members. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459-60 (2013). Therefore, Plaintiff establishes that common issues predominate for each of these elements of Plaintiff's Section 10(b) and Rule 10b-5 claim.

### a. Damages

Plaintiff also argues that there is a class-wide methodology for calculating damages. Plf. Br. at 35-37. A plaintiff is not required to establish precise damages calculations at the class certification stage. *Roofer's Pension Fund*, 333 F.R.D. at 88. Here, Plaintiff explains that damages from the artificial inflation of Celgene common stock "can be determined for any member of the Class by applying the widely accepted 'out-of-pocket' measure of damages." Plf. Br. at 36. While Plaintiff concedes that this will result in differing amounts of damages based each class member's specific transactions in Celgene common stock, "[c]lass certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages." *In re Novo Nordisk Sec. Litig.*, No. 17-209, 2020 WL 502176, at *9 (D.N.J. Jan. 31, 2020). Moreover, "in securities cases . . . where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be an 'abuse of discretion.'" *Id.* (quoting *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015)). Defendants also do not appear to dispute Plaintiff's proposed method of calculating damages. As a result, the Court concludes that questions of damages common to the class predominate over individual issues.

16

## b. Reliance

To establish reliance, Plaintiff invokes the rebuttable *Basic* presumption. *See Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 268 (2014). Defendants maintain that Plaintiff cannot establish reliance on a class-wide basis because they rebut the *Basic* presumption. Defs. Opp. at 23-38.

The presumption is based on the economic theory "that the market price of shares traded on well-developed markets reflects all publicly available information," such that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988); *see also In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 n. 5 (3d Cir. 2005) (explaining that in an efficient market, "'information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices.'" (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1415 n. 1, 1419 n. 8 (3d Cir. 1997)). To establish reliance through the *Basic* presumption, a plaintiff must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. If a plaintiff satisfies this *prima facie* showing, a defendant can rebut the *Basic* presumption by demonstrating "that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'" *Id.* at 263-64, 269. In addition, a defendant "need only produce enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'" *Bing Lin*, 324 F.R.D. at 344 (citing *Lupyan v. Corinthian Colls., Inc.*, 761 F.3d 314, 320 (3d Cir. 2014)). If a defendant rebuts the presumption, the matter cannot

17

proceed as a class action because individual issues of reliance will predominate over common questions of law and fact. *Halliburton II*, 573 U.S. at 281-82.

AMF presents a *prima facie* case establishing that the *Basic* presumption applies: (1) Defendants' alleged misrepresentations were public statements made to investors and the public at large; (2) the alleged misrepresentations were material; (3) Celgene stock traded in an efficient market[8]; and (4) Plaintiff and all other members of the putative class purchased Celgene common stock during the period in which Defendants made the purported misrepresentations and when the truth was revealed. To rebut the presumption, Defendants' rely on their expert report, which, in part, critiques a study performed by Plaintiff's expert. According to Dr. Gompers, Defendants' expert, the study demonstrates that except for two alleged misrepresentations, for which Plaintiff lacks standing, there was no front-end price impact associated with the actionable misrepresentations, or in other words, Celgene's stock did not increase after the alleged wrongful statements. Defs. Opp. at 26. Defendants continue that this evidence alone is sufficient to rebut the *Basic* presumption. *Id.*

---

[8] To assess market efficiency, courts apply the *Cammer* factors, which are as follows: "(1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstratable cause and effect relationship between the release of information about the company and movements in the stock price." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.* No. 12-5275, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). A court should also consider "(1) the magnitude of the company's market capitalization; (2) the size of the bid-ask spread for the company's stock . . . ; and (3) the company's float." *Id.* (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005)). Moreover, Celgene common stock traded on the NASDAQ during the Class Period, *see* Cecchi Decl., Ex. 1 at ¶¶ 27, 48, which also "weighs in favor of a finding of market efficiency." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011). Defendants do not challenge Plaintiff's evidence or conclusion about market efficiency.

Plaintiff counters that "[m]istatements need not cause a stock price increase to establish reliance—they can instead *maintain* existing inflation in the stock price." Plf. Reply at 19. But Defendants respond that a maintenance theory is not sufficient in light of their evidence of no price impact. Defs. Opp. at 27. Under the price maintenance theory "statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price." *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017). And "price impact is shown if, when the truth is revealed, the artificial inflation in the stock price (maintained as a result of a repeated misrepresentation) dissipated and the price of the stock fell." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-1580, 2019 WL 5287980, at \*21 (S.D.N.Y. Oct. 18, 2019).

The Third Circuit has not addressed if a plaintiff that invokes the *Basic* presumption can rely on a price maintenance theory. Therefore, Defendants argue that this Court should follow the Eighth Circuit's approach in *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775 (8th Cir. 2016). Defs. Opp. at 27. In *Best Buy*, the plaintiffs alleged that the defendants made actionable misrepresentations in a press release and during a conference call that occurred a few hours after the press release was issued. The district court dismissed the plaintiffs' claims as they pertained to the press release. Thus, the only actionable misrepresentations occurred during the conference call. *Best Buy*, 818 F.3d at 777-78. At the class certification stage, the defendants relied on the plaintiffs' own expert to rebut the *Basic* presumption because the plaintiffs' expert "opined that the 'economic substance' of the non-fraudulent press release statements and the alleged misrepresentations in the immediately following conference call was 'virtually the same.'" *Id.* at 782. Further, the expert's study showed that the press release had an immediate impact on the market price, while the alleged misrepresentations during the conference call had no additional

19

price impact. As a result, the plaintiffs' expert "opined that investors gave the EPS guidance in the press release 'great weight.' Combined with the absence of further price impact following the conference call, this was direct evidence that the investors did not rely on the executives' confirming statements two hours later." *Id.* The defendants' expert reached the same conclusion. *Id.*

On appeal, the Eighth Circuit determined that the plaintiffs met their *prima facie* burden to establish that the *Basic* presumption applied and that the defendants presented evidence that rebutted the presumption. *Id.* at 782. The *Best Buy* court indicated that the plaintiffs' expert opinion demonstrating "no 'front-end' price impact rebutted the *Basic* presumption." *Id.* The court in *Best Buy* continued that the plaintiffs' theory of price maintenance, based on the fact that the stock price did not change after the conference call, "provided no evidence that refuted defendants' overwhelming evidence of no price impact." *Id.* at 783. Thus, the Eighth Circuit's decision was based on the specific evidence presented in that matter – namely that the plaintiffs' own expert attributed the entire price change to the press release. Because the plaintiffs' expert opined that the alleged misrepresentations during the call did not impact the stock price, the *Best Buy* court refused to credit the plaintiffs' price maintenance theory argument.

But the Eighth Circuit did not, as Defendants argue, outright reject the price maintenance theory. *See Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, No. 18-871, 2020 WL 5757695, at *12 (D. Minn. Sept. 28, 2020) ("While the Eighth Circuit has not explicitly endorsed the price maintenance theory, it has not rejected the theory."). Yet, even if this Court did read *Best Buy* as adopting a wholesale repudiation of the price maintenance theory, the position appears to be the minority view as the Second, Seventh, and Eleventh Circuits have all explicitly adopted the theory. *See Waggoner*, 875 F.3d at 104 (recognizing that the plaintiffs were relying on a price maintenance

theory, "which we have previously accepted" and that "the district court was well within its discretion in concluding that the lack of price movement on the dates of the alleged misrepresentations does not rebut the *Basic* presumption"); *Glickenhous & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 419 (7th Cir. 2015) (recognizing that a plaintiff can rely on a price maintenance theory); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011) ("Defendants whose fraud *prevents* preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock market in the first instance.").[9]

District courts within the Third Circuit have also recognized that a plaintiff can proceed on a price maintenance theory. *See, e.g.*, *Prudential Fin., Inc.*, 2015 WL 5097883, at *12 n. 8 ("[I]t also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact. It is possible that those statements assisted in the maintaining an inflated price[.]"); *see also W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016) (same). Accordingly, the weight of authority and the persuasiveness of the reasoning demonstrate that Plaintiff can also proceed through a price maintenance theory.

The Court, therefore, turns to Defendants' evidence to determine whether they rebut the *Basic* presumption. To do so, Defendants must produce evidence "demonstrating that the purported misrepresentation or material omission had no price impact." *Bing Li*, 324 F.R.D. at 343. Defendants fail to do so.

---

[9] The Second and Seventh Circuits recently reaffirmed the validity of the price maintenance theory. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020) (explaining that the Circuit previously endorsed the "inflation maintenance" theory "and affirm[s] its viability again now"); *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 264 (2d Cir. 2020) (explaining that "inflation-maintaining statements" can be sufficient to demonstrate a price impact).

21

In the December 19 Opinion, the Court determined that Plaintiff sufficiently pled facts establishing that the price of Celgene common stock fell after Celgene made its corrective disclosures for Otezla and Ozanimod. Dec. 19 Opinion at 47. Now, Defendants simply maintain that Plaintiff's expert's event study "demonstrates that there was no front-end price impact . . . associated with any of the alleged misstatement that AMF contends still remain in the case, except for two." Defs. Opp. at 26 (citing Declaration of Nidhi Yadava ("Yadava Decl."), Ex. 1 at ¶¶ 24-25). Because Plaintiff is relying on the price maintenance theory, this evidence does not rebut the *Basic* presumption. Defendants provide no further evidence to suggest that the purported misrepresentations and omissions did not actually affect the market price. Accordingly, Plaintiff establishes reliance under the *Basic* presumption.

Defendants also argue that even under the price maintenance theory, reliance cannot be presumed after February 27, 2018, the date when Celgene announced that the FDA rejected the Ozanimod NDA. Defs. Opp. at 28. Plaintiff counters that the Class Period should continue until April 29, 2018, when Morgan Stanley reported that the Ozanimod NDA would likely be delayed one to three years because of the need for additional testing. Plf. Reply at 21-26. "[C]ourts are required to cut off the Class Period on the date of a statement or event that cures the market. Where, however, there is an issue of fact as to whether a particular disclosure cured the market . . . a broader time period should be certified." *In re Chi. Bridge & Iron Co.*, 2019 WL 5287980, at *40.

Here, Celgene's alleged misrepresentations about Ozanimod addressed the timing of its NDA, specifically that Celgene was on-track to submit the application by the end of 2017. Plaintiff alleges that these statements were misleading because after Celgene discovered the Metabolite, it knew that the NDA would be rejected. Moreover, in the December 19 Opinion, the Court

22

determined that Defendants' failure to disclose the Metabolite discovery and the need for additional testing are actionable half-truths. Dec. 19 Opinion at 36. Thus, Celgene's February 27, 2018 announcement did not fully correct the market because on February 27, Celgene only announced that it had received an RFT from the FDA. SAC ¶ 489. Critically, Celgene did not disclose the Metabolite or that additional testing was necessary. Approximately two months later, Plaintiff contends that the market finally learned about the Metabolite, and on April 29, 2018, that it would take one to three years to complete the necessary additional testing. *Id.* ¶¶ 495-503. Accordingly, it appears as if the alleged misstatements and omissions were not fully cured until April 29.

Defendants, however, contend that before April 29, analysts had already predicted multiyear delays for Ozanimod, and that the market had already reacted to this news. Defs. Opp. at 31. Defendants' expert, Dr. Gompers, explains that the April 29 report was based on "previously published studies and FDA guidance," and Plaintiff's expert "acknowledged in deposition that he was also able to obtain the information that Morgan Stanley utilized to form its [April 29] opinion." Yadava Decl. Ex. 1 at ¶ 44. But Defendants merely attack Plaintiff's expert report. This is insufficient to rebut the *Basic* presumption as a defendant "bears the burden to prove a lack of price impact through *direct evidence*." *Prudential*, 2015 WL 5097883, at *12 (emphasis added); *see also DFC Glob. Corp.*, 2016 WL 4138613, at *14 (explaining that the defendants failed to rebut the *Basic* presumption because "[t]hey did not include their own event study and instead have simply tried to attack Plaintiff's expert"). Defendants do not provide their own evidence demonstrating that the market had already reacted to news of the Metabolite or the delay caused by additional testing, or otherwise explain why the price drop occurred on April 30. *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n. 18 (2d Cir. 2020) ("Thus,

23

for a defendant to erase the inference that the corrective disclosure had price impact—*i.e.*, that it played some role in the price decline—it must demonstrate under the preponderance-of-the-evidence standard, using event studies or other means, that the other events explain the entire price drop.").

In sum, Defendants fail to rebut the *Basic* presumption of reliance for the entire proposed Class Period.[10] The Court, therefore, concludes that Plaintiff satisfies the predominance requirement because common issues of law and fact predominate over individualized inquiries.

### 2. Superiority

To assess superiority, courts consider (1) class members' interests in individually controlling separate actions; (2) the extent and nature of litigation of any related litigation that is already underway; (3) the desirability of concentrating litigation of the claims in the particular forum; and (4) the manageability of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). In considering these factors, Plaintiff argues that class actions are a superior method to adjudicate securities fraud claims because there are many individual plaintiffs who have suffered from a relatively small amount of damage. Plaintiff also contends that class members' interests in individually controlling separate matters is minimal and Plaintiff is not aware of any other pending related matters. Finally, Plaintiff argues that concentrating the claims is this forum is desirable because this Court is already familiar with the matter. Plf. Br. at 38. The Court agrees and finds that Plaintiff satisfies the superiority requirement.

---

[10] Plaintiff contends that if the Court rejects its *Basic* presumption argument, reliance can be established through the *Affiliated Ute* presumption. Plf. Br. at 34-35. Because the Court concludes that the *Basic* presumption applies and that Defendants fail to rebut the presumption, the Court does not address the *Affiliated Ute* presumption.

### 3. Ascertainability

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. "However, a plaintiff need not 'be able to identify all class members at class certification – instead, a plaintiff need only show that class members can be identified.'" *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 (3d Cir. 2020) (quoting *Byrd*, 784 F.3d at 163 (internal quotation omitted)). The class here consists of all persons and entities who purchased or otherwise acquired Celgene common stock during the Class Period. This group can easily be identified by referencing shareholder acquisition records. Consequently, the proposed class is ascertainable.

## IV.  CLASS DEFINITION

Rule 23(c)(1)(B) requires that the class-certification order or incorporated opinion indicate "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Byrd*, 784 F.3d at 163 (citing *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006)). Therefore, the Court certifies a Rule 23(b)(3) class consisting of

> All persons and entities who purchased the common stock of Celgene Corp. between April 27, 2017 through and April 27, 2018, and were damaged thereby. Excluded from the class are: (i) Celgene; (ii) any directors and officers of Celgene during the Class Period and members of their immediate families; (iii) the subsidiaries, parents and affiliates of Celgene; (iv) any firm, trust,

corporation or other entity in which Celgene has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party.

## V.     CONCLUSION

For the reasons stated above, Plaintiff's motion for class certification (D.E. 90) is

**GRANTED**.  An appropriate Order accompanies this Opinion.

Dated: November 25, 2020

_____
John Michael Vazquez, U.S.D.J.

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

*In re* CELGENE CORPORATION
SECURITIES LITIGATION

Civil Action No. 18-4772

**ORDER**

---

**John Michael Vazquez, U.S.D.J.**

For the foregoing reasons, and for good cause shown,

IT IS on this 25th day of November 2020,

**ORDERED** that Plaintiff's motion for class certification (D.E. 90) is **GRANTED**; and it is further

**ORDERED** that the Court certifies a Federal Rule of Civil Procedure 23(b)(3) class in this matter consisting of the following:

> All persons and entities who purchased the common stock of Celgene Corp. between April 27, 2017 through and April 27, 2018, and were damaged thereby. Excluded from the class are: (i) Celgene; (ii) any directors and officers of Celgene during the Class Period and members of their immediate families; (iii) the subsidiaries, parents and affiliates of Celgene; (iv) any firm, trust, corporation or other entity in which Celgene has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party.

John Michael Vazquez, U.S.D.J.